THE S. S. SAN ANGELO.

CAPILLA et al. v. PACIFIC–ATLANTIC S. S. CO.

WRIGHT v. SAME.

Nos. 89, 91.

District Court, E. D. Pennsylvania.
Aug. 25, 1937.

Freedman & Goldstein, of Philadelphia, Pa., for libellants.

Rawle & Henderson, of Philadelphia, Pa., for respondents.

KIRKPATRICK, District Judge.

These two suits in admiralty (consolidated by agreement of counsel) were brought by members of the crew of the S. S. "San Angelo" to recover the sum of $125 for each man, alleged to be due under the terms of the shipping articles. Their claim is based upon the following rider, attached to the articles:

"In event vessel lays up in any Atlantic coast port for any reason for which the crew is not responsible, crew to be paid up to time the vessel lays up, and to be paid one hundred and twenty-five dollars ($125.00) additional in cash in lieu of transportation, subsistence, lodging and wages back to Pacific coast."

▇▇ Testimony was offered and received under objection to show construction which the libellants put upon this rider at the time of its insertion into the articles. So far as this testimony relates to the reasons for including the rider, it is immaterial. So far as it relates to the libellants' private understanding of what the effect of the rider is concerned, it is incompetent. If the effect of it is to manufacture a parol agreement that the men were to be paid transportation back to the Pacific Coast in the event that they should force the ship to lie up by striking or by refusing to perform certain duties from sympathy with other strikers, it must be rejected as not credible. The plain and unambiguous language of the rider therefore controls, and the only question involved is whether the reason which caused the vessel to lie up in Philadelphia was one for which the crew was not responsible. See opinion of Judge Welsh in Kauffeldt et al. v. American Hawaiian S. S. Co., etc.,[1] In Admiralty Number 83 of 1936.

▇▇ Of course, the immediate reason why this ship lay up in Philadelphia was that the Master paid off the crew and let them go. However, that does not dispose of the matter. If the crew gave the Master to understand that they would not work or assist in unloading the vessel, he was not bound to retain them indefinitely on the payroll but was justified in terminating the employment, nor he could not have been reasonably expected to take his ship out of port without discharging the cargo for Philadelphia.

▇▇ The fact issues then are,—Did the crew advise the Master that they would refuse to work at unloading the cargo, for an indefinite period? If so, were there any circumstances or events for which they were not responsible which made necessary or justified such a refusal? By the last, I have in mind that if there had been an armed mob on the pier threatening them with violence if they worked, it would have justified a refusal to assist in unloading and would have furnished a reason for which they were not responsible for the ship's lying up, if that should follow. On the other hand if it was merely a strike without violence, and they refused to work through sympathy or because the strike was being conducted by their own union or because of orders from their union heads, then it must be said that the lay-up was due to the cause for which they were responsible.

▇▇ Now, what happened? The testimony is confusing because the situation which it described was a confused one. The "San Angelo" docked at 7:45 A. M. Saturday, October 31, 1936. At that time, there was a strike which had resulted in tying up shipping on the entire West Coast, and which had been in progress for some time. Everyone on the ship rather expected that they would find labor troubles either exist-

---

ing or about to break out in Philadelphia, and there was general uncertainty.

At 8 o'clock, there were apparently two gangs of stevedores, sufficient in number to unload the cargo, on the pier head. They did not go aboard the ship at any time, and must have left rather early, because the Stevedoring Company made no charge for their time. There was sufficient steam up to operate the winches, but when the stevedores failed to appear on deck, the chief engineer ordered the deck engineer to cut it off from the deck until they were ready to use it. Steam was kept up in the boilers and could have been brought to the deck by merely turning on a valve.

The crew remained on the ship during Saturday morning. As to whether or not they refused to work, the testimony is conflicting and unsatisfactory. In all probability, the delegates appointed by the crew and the crew themselves were uncertain both in their own minds and in what they said as to whether they were going to furnish power for unloading the cargo, in view of the strike on the West Coast and a few of the Ship Cleaners' Union pickets on the dock in front of the "San Angelo". The Master also was probably in doubt as to what course he ought to take. If he did give a definite order, it may have been transmitted to the crew in the form of an inquiry as to what they intended to do when the stevedores returned or something of a similar nature. At any rate, he took no steps at that time to pay them off, and everyone seemed disposed to postpone the "showdown" until Monday. I do not think it essential to make more definite findings as to this period, because it seems to me that what occurred on Monday settles the matter.

On Monday, November 2, there was still sufficient steam in the boilers to operate the winches, and at 8 o'clock there were again two gangs of stevedores at the pier head. There was also a much heavier picket line, this time including some men belonging to unions allied to those of the crew and engine room men. On Monday morning, two delegates representing the seamen and the engine room crew definitely informed the master and the Chief Engineer that they could not furnish steam so long as there was a picket line in front of the ship. This action was taken by them, not as the result of any physical interference with unloading caused by the picket line or of any threats of violence, for there is no evidence of anything of that sort, but because of their own union sympathies and affiliations. They agreed to keep sufficient steam up for fire protection and refrigeration, but unequivocally refused to furnish steam for the unloading of the cargo.

Faced with this point-blank refusal to unload the cargo, the Master decided to pay the men off. He told them that the Commissioner would come aboard Monday afternoon and called the men into the salon for the purpose of paying them off, and at that time, a dispute arose about the rider and nothing was done. But the Master directed the men to go to the Shipping Commissioner's office, Tuesday, at 9 o'clock. This they did, and after some dispute and after again stating the reason given the Master for their refusal to assist in discharging the cargo, received their pay. They did not thereafter return to the ship except to get their belongings. No one could tell how long the labor disturbances at Philadelphia were going to last, and, it being apparent that the cargo could not be discharged as long as they did, the ship was laid up in Philadelphia.

In view of the testimony I cannot accept the libellants' contention that the crew were standing by, ready and willing to help unload, and that the Master simply got tired of waiting for the stevedores to come on deck and paid off the crew.

I find as a fact that the vessel laid up in Philadelphia for a reason for which the crew was responsible.

The statements of fact and law in this opinion may be considered as special findings of fact and conclusions of law.

The libels may be dismissed.